**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 22-cv-00643-NYW-SKC

IVANTI, INC.,

     Plaintiff,

v.

PATCH MY PC, LLC,

     Defendant.

---

## ORDER ON MOTION TO DISMISS

This matter is before the Court on Defendant Patch My PC, LLC's Motion to Dismiss (the "Motion" or "Motion to Dismiss") [Doc. 18]. The Court has reviewed the Motion, the related briefing, and the applicable case law, and concludes that oral argument would not materially assist in the resolution of this matter. For the reasons set forth herein, the Motion to Dismiss is respectfully **GRANTED**.

## BACKGROUND

This case revolves around three patents: United States Patent No. 6,990,660 ("the '660 Patent");[1] United States Patent No. 7,823,147 ("the '147 Patent"); and United States Patent No. 8,407,687 ("the '687 Patent") (collectively, the "Patents-in-Suit").[2] [Doc. 1 at ¶¶ 7–10]. The

---

[1] The '660 Patent was subject to an Ex Parte Reexamination in which original claims 6, 7, 49–50 were canceled; Claims 1–5, 8–23, 25–47, 51–52, and 53–61 were determined patentable as amended; and claim 48 was determined to be patentable as written. [Doc. 1-1 at 33]. The Reexamination Certificate was issue on May 12, 2009. [*Id.*].

[2] The '147 Patent is a continuation of the '660 Patent, and the '687 Patent is a continuation of the '147 Patent. [Doc. 1-2 at 2]. "A continuation patent application is an application filed subsequently to another application, while the prior application is pending, disclosing all or a

Court takes the following facts from the Complaint for Patent Infringement (the "Complaint") [Doc. 1] and the Patents-in-Suit, and presumes they are true for the purposes of this Order.

These patents "relate to systems and methods for updating existing software across a remote network based on the use of patch fingerprints to check for the need to update software and then update[e] that software as required." [*Id.* at ¶ 7]; *see also* [*id.* at ¶ 11 (alleging that the Patents-In-Suit relate to '[m]ethods, systems, and configured storage media . . . for discovering software updates, discovering if a given computer can use the software update, and then updating the computers with the software as needed automatically across a network without storing the updates on an intermediate machine within the network.'") (quoting Doc. 1-1 at 2)[3]].[4]   The subject inventions "facilitate software development, software installation, software updating, and file distribution based on software and patch finger printing across multiple operating systems and devices, across a network." [*Id.* at ¶ 11 (quoting Doc. 1-1 at col. 3, ll. 33–37) (alterations omitted)].

The systems and methods in the Patents-in-Suit contemplate the following components: a "package computer," an "update server," and a "target computer." [*Id.* at ¶ 12].   The package computer maintains software patches that may be needed to update target computers within the

_____

substantial part of the subject-matter of the prior application and containing claims to subject-matter common to both applications, both applications being filed by the same inventor or his legal representative." *FastShip, LLC v. United States*, 892 F.3d 1298, 1301 (Fed. Cir. 2018) (citing *U.S. Water Servs., Inc. v. Novozymes A/S*, 843 F.3d 1345, 1348 n.1 (Fed. Cir. 2016) (internal quotation marks and citation omitted). Thus, the Patents-in-Suit share a common specification. For ease of reference, this Court will refer to the specification of the '660 Patent.

[3] When citing to a Patent-in-Suit, the Court cites to the document number generated by the CM/ECF system as well as the ECF page number or the column and line numbers provided by the Patent.

[4] The Court can consider documents attached to the Complaint if they are central to the plaintiff's claims and if the parties do not dispute their authenticity. *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1103 (10th Cir. 2017).   "It is also well-established that a court may take judicial notice of patents or patent applications." *Anderson v. Kimberly-Clark Corp.*, 570 F. App'x 927, 932 n.3 (Fed. Cir. 2014).

network.  [*Id.*].  The update server accesses those software patches so that the patches can be deployed to the target computers within the network.  [*Id.*].  The update server may also include "a repository component" that maintains "patch fingerprint" information and information about the network's target computers.  [*Id.*].

Patch fingerprints maintain software patch information and permit the system to determine if a given software package should be loaded onto a target computer.  [*Id.* at ¶ 13].  The system uses information in the patch fingerprint, inventory library, and specific information gleaned from each target computer to "intelligently recommend which patches and drives are required for a given [target] computer."  [*Id.* (quoting Doc. 1-1 at 13, 3:66–4:3)].  The system may also include a "discovery agent," which can be used to "discover the hardware and software on a target machine" and "return scan results for patch fingerprints, which indicate whether it is appropriate to install a specific patch associated with each fingerprint."  [*Id.* at ¶ 14 (quoting Doc. 1-1 at 13, 4:4–14) (alteration marks omitted)].

Plaintiff Ivanti, Inc. ("Plaintiff" or "Ivanti") "owns all substantial rights" to the Patents-in-Suit, "including the right to sue and recover damages for all infringement thereof."  [*Id.* at ¶¶ 7–10].  Ivanti alleges that Defendant Patch My PC, LLC ("Defendant" or "Patch My PC") has infringed on each of the Patents-in-Suit.  Specifically, Plaintiff alleges that Defendant's "manufacture, sale, offer for sale, and use of . . . patching services . . ., including, but not limited to, Enterprise Plus, Enterprise, and InTune only subscriptions" (the "Accused Instrumentalities") infringes on "at least" Claim 1 of the '660 Patent, the '147 Patent, and the '687 Patent (the "Asserted Claims").  [*Id.* at ¶¶ 15, 42, 51].  Generally, and according to Plaintiff, the Accused Instrumentalities automate the process of updating software for a system of client computers, or target computers, by downloading software updates from a package computer to an update server,

using a patch fingerprint to identify software updates and their applicability to a target computer, gathering information about the target computers, and deploying updates to target computers. [*Id.* at ¶¶ 22–23]. Ivanti further avers that Patch My PC received notice of its patent infringement on November 2, 2021 and has continued to infringe upon the Patents-in-Suit, rendering its infringement willful and deliberate. [*Id.* at ¶¶ 16, 19, 43, 46, 52, 55]. As a result of Patch My PC's infringement, Ivanti seeks damages for infringement and willful infringement. [*Id.* at ¶¶ 17, 44, 53].

Plaintiff initiated this lawsuit on March 15, 2022, asserting one count of patent infringement for each Patent-in-Suit against Defendant. *See* [*id.* at ¶¶ 6–27]; *see also* [Doc. 36]. Defendant filed the instant Motion to Dismiss on May 5, 2022, arguing that each of Plaintiff's counts should be dismissed under Rule 12(b)(6) because the Patents-in-Suit all claim unpatentable subject matter. *See generally* [Doc. 18]. The Motion is fully briefed. [Doc. 24; Doc. 30]. The Court discusses the Parties' respective arguments below.[5]

## LEGAL STANDARD

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a motion under Rule 12(b)(6), the Court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)). Nevertheless, a plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rather,

---

[5] This case was reassigned to the undersigned on August 8, 2022 upon her appointment as a United States District Judge. *See* [Doc. 32].

4

"a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (explaining that plausibility refers "to the scope of the allegations in a complaint," and that the allegations must be sufficient to nudge a plaintiff's claim(s) "across the line from conceivable to plausible").  The ultimate duty of the Court is to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

## ANALYSIS

### I.     Subject Matter Patentability

Patch My PC argues that Ivanti's claims must be dismissed under Rule 12(b)(6) because the claimed inventions in the Patents-in-Suit are not patentable and are thus invalid under 35 U.S.C. § 101, *see* [Doc. 18 at 16–26], which provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title."  35 U.S.C. § 101.  "The Supreme Court has identified three types of subject matter that are not patent-eligible: 'Laws of nature, natural phenomena, and abstract ideas are not patentable.'" *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1367 (Fed. Cir. 2020) (quoting *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014)).  The 'abstract ideas' category, the subject matter at issue in this case, embodies 'the longstanding rule that an idea of itself is not patentable.'" *Id.* (quoting *Alice*, 573 U.S. at 218 (alteration marks omitted)).

In *Alice*, the Supreme Court articulated a two-step framework for determining patent eligibility. *See generally* 573 U.S. 208.  In the first step, the Court "determines whether the claims

at issue are directed to a patent-ineligible concept." *Id.* at 218.  This step "plainly contemplates that the first step of the inquiry is a meaningful one, i.e., that a substantial class of claims are *not* directed to a patent-ineligible concept*." Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016).  "The 'directed to' inquiry, therefore, cannot simply ask whether the claims *involve* a patent-ineligible concept," *id.*, but assesses "whether the claims . . . focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery." *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1312 (Fed. Cir. 2016).  If the Court concludes that the claims are not directed to a patent-ineligible concept, the inquiry under § 101 ends.  *Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999, 1007 (Fed. Cir. 2018).

"If the claims are directed to a patent-ineligible concept, however," the Court "next consider[s] *Alice* step two." *Id.*  At step two, the Court looks at "the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Alice*, 573 U.S. at 217 (quoting *Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66, 78–79 (2012)).  This second step is "a search for an 'inventive concept'—i.e., an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Id.* at 217–18 (alteration in original) (quoting *Mayo*, 566 U.S. at 72–73).

## II.     Whether Subject Matter Patentability May Be Decided on a Motion to Dismiss

Plaintiff first challenges Defendant's contention that subject matter eligibility under § 101 is a threshold question.  [Doc. 24 at 12].  It asserts that the Federal Circuit has "rejected the idea that § 101 issues 'must be addressed' before other issues," and has instead directed courts to

"exercise 'their inherent power to control the processes of litigation' to 'avoid the swamp of verbiage that is § 101.'" [*Id.* (quoting *MySpace, Inc. v. Graphon Corp.*, 672 F.3d 1250, 1258, 1260 (Fed. Cir. 2012))].[6]  Plaintiff argues that its allegations detailing the inventive concepts of the claims must be accepted as true, and for this reason, "fact issues exist regarding Step 2 of the *Alice* analysis, precluding dismissal at the pleading stage." [*Id.*].

"Subject matter eligibility under § 101 may be determined at the Rule 12(b)(6) stage of a case." *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 765 (Fed. Cir. 2019); *see also Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018) ("Patent eligibility has in many cases been resolved on motions to dismiss.").  "Patent eligibility under § 101 is a question of law that may involve underlying questions of fact," *Simio, LLC v. FlexSim Software Prod., Inc.*, 983 F.3d 1353, 1358–59 (Fed. Cir. 2020), and thus, resolution of the issue may involve "subsidiary fact questions that must be resolved en route to the ultimate legal determination." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018)).  Specifically, at the *Alice* test's second step, the Court is tasked with determining whether the elements involve "'well-understood, routine, [and] conventional activity previously engaged in by researchers in the field," and if they do, "they do not constitute an 'inventive concept.'" *Id.* (quoting *Mayo*, 566 U.S. at 73) (brackets in original).  But "[w]hether the claim elements or the claimed combination are well-understood, routine, [and] conventional is a question of fact." *Id.*

---

[6] In *MySpace*, a case decided before *Alice*, the Federal Circuit stated that "courts could avoid the swamp of verbiage that is § 101 by exercising their inherent power to control the processes of litigation, . . . and insist that litigants initially address patent invalidity issues in terms of the conditions of patentability defenses as the statute provides, specifically §§ 102, 103, and 112," before addressing patent eligibility under § 101.  *MySpace*, 672 F.3d at 1260.  But Defendant does not raise any defense under §§ 102, 103, or 112 in its Motion to Dismiss.  *See generally* [Doc. 18].

The Federal Circuit has therefore cautioned that dismissal "at this early stage . . . is appropriate 'only when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law.'" *ChargePoint*, 920 F.3d at 765 (quoting *Aatrix*, 882 F.3d at 1125). "When considering eligibility under a Rule 12 motion, [the Court] take[s] the facts alleged in the complaint as true." *Int'l Bus. Machines Corp. v. Zillow Grp., Inc.*, 50 F.4th 1371, 1377 (Fed. Cir. 2022). "In addressing this question, the Court may only look to allegations in 'the sources properly considered on a motion to dismiss, such as the complaint, the patent, and materials subject to judicial notice.'" *Interactive Wearables, LLC v. Polar Electro Oy*, 501 F. Supp. 3d 162, 170 (E.D.N.Y. 2020) (quoting *Aatrix*, 882 F.3d at 1128).

Thus, at this stage, Court must determine whether, accepting all of the allegations in the Complaint as true, there are sufficient factual allegations to create a question of fact precluding resolution of the issue at the pleading stage—e.g., whether there are "concrete allegations . . . that individual elements and the claimed combination are not well-understood, routine, or conventional activity" or "concrete allegations regarding the claimed combination's improvement to the functioning of the computer." *Aatrix*, 882 F.3d at 1128. While the *Aatrix* holding does not mean that "any allegation about inventiveness, wholly divorced from the claims or the specification, defeats a motion to dismiss," the Federal Circuit has instructed that "plausible and specific factual allegations that aspects of the claims are inventive are sufficient." *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1317 (Fed. Cir. 2019). Accordingly, the Court concludes that a motion to dismiss is not a *per se* unavailable vehicle to determine eligibility under § 101.[7]

---

[7] The Court also notes that Plaintiff does not contend any claim construction is required at this juncture. *See generally* [Doc. 24].

### III.   Representative Nature of the First Independent Claims of each Patent-in-Suit

In its Response, Plaintiff first contends that Claim 1 of each of the Patents-in-Suit is not representative for a § 101 analysis. [Doc. 24 at 12]. Thus, before this Court turns to the Parties' substantive analysis under *Alice*, it first considers whether Claim 1 of each of the respective Patents-in-Suit are representative of all claims for the purposes of a § 101 determination. [Doc. 18 at 15; Doc. 24 at 12]. As discussed above, the Patents-in-Suit share a common specification. *See supra* n.2. "Courts may treat a claim as representative in certain situations, such as if the patentee does not present any meaningful argument for the distinctive significance of any claim limitations not found in the representative claim or if the parties agree to treat a claim as representative." *Berkheimer*, 881 F.3d at 1365 (citing *Elec. Power Grp. v. Alstom S.A.*, 830 F.3d 1350, 1352 (Fed. Cir. 2016)).

Ivanti contends that claims related to the monitoring of the target computer post-update for any problems and responding to those problems distinguish those dependent claims from the first independent claim of their respective Patents-in-Suit and provide an improvement to prior patch management systems. [Doc. 24 at 13 (citing '660 Patent Claims 11–13, 17, 18, 20, 21; '147 Patent Claim 6; '687 Patent Claim 7)]. Patch My PC contends that Claim 1 of each of the Patents-in-Suit is appropriately representative, arguing that the cited dependent claims merely recite the same process, without any technical improvement. [Doc. 30 at 6]. Defendant specifically contends that the "monitoring" elements of the cited dependent claims do not provide a technological improvement or inventive concept to overcome their abstract nature. [*Id.* at 6–7].

As an initial matter, Ivanti implicitly concedes that Claim 1 of each of the first independent claims are representative of claims that do not contain limitations directed at post-installation monitoring for each of the respective Patents-in-Suit. *Compare* [Doc. 18 at 11–15] *with* [Doc. 24

9

at 12–13].  *See Berkheimer*, 881 F.3d at 1365 (observing that courts may treat an independent claim as representative "if the patentee does not present any meaningful argument for the distinctive significance of any claim limitations not found in the representative claim").  In turn, this Court concludes that the first independent claim of each of the Patents-in-Suit is representative of all other claims that do not include post-installation monitoring functionality.

Next, this Court turns to considering the representative nature of the first independent claims to those claims that do include post-installation monitoring.  Significantly, it is not clear to this Court which of the dependent claims cited as distinct by Ivanti that include post-installation monitoring are actually asserted against Patch My PC.  The Complaint in this action only alleges infringement of "at least" the first independent claim of each Patent-in-Suit.  *See* [Doc. 1 at ¶¶ 15, 42, 51; Doc. 18 at 3].  The Scheduling Order does not contain any further information regarding the Asserted Claims, [Doc. 31], and Plaintiff's Infringement Contentions that were due on August 22, 2022 are not filed with the Court under the Local Patent Rules.  D.C.COLO.LPtR 4(a).

*'660 Patent.*  Defendant argues that Claim 1 of the '660 Patent as reexamined does include a monitoring step, and therefore, this first independent claim is representative of all other claims— even those that include a post-installation monitoring limitation.  *See* [Doc. 30 at 6].  This Court respectfully agrees, and concludes that independent Claim 1 of the '660 Patent is representative of all other claims.[8]

*'687 Patent.*  The Parties' Joint Disputed Claim Terms Chart identifies terms that appear in Claims 1, 4 of the '687 Patent, but not Claim 7—the claim that Ivanti relies upon to contend that Claim 1 of the '687 Patent is not representative.  [Doc. 24 at 13].  "The question of eligible

---

[8] But Defendant does not argue or brief whether that claim can be representative of claims from other Patents-in-Suit.  *See* [Doc. 18 at 11–14; Doc. 30 at 6–7].

subject matter must be determined on a claim-by-claim basis," *Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335, 1340 (Fed. Cir. 2013), *cert. granted, judgment vacated sub nom. on other grounds*, *WildTangent, Inc. v. Ultramercial, LLC*, 573 U.S. 942 (2014), and this Court is mindful that its determination should not decide questions that do not affect the rights of litigants before it. *See Preiser v. Newkirk*, 422 U.S. 395, 401 (1975). Thus, the Court does not pass on whether independent Claim 1 of the '687 Patent is representative of Claim 7. [9]

    ***'147 Patent.*** The Parties' Joint Disputed Claim Terms chart identifies Claims 1, 3, 5, 6 of the '147 Patent, and Ivanti identifies Claim 6 as distinguishable from Claim 1. [Doc. 24 at 13]. Thus, this Court turns its focus on whether Claim 1 of the '147 Patent is representative of Claim 6.

    Claim 1 of the '147 Patent discloses a system comprising:

    (a) a package computer having a plurality of patch fingerprints;
        (i) wherein the plurality of patch fingerprints includes at least a first patch fingerprint and a second patch fingerprint, different than the first patch fingerprint;
        (i) wherein at least the first and second patch fingerprints each comprises at least one Extensible Markup Language (XML) metadata query, wherein the first patch fingerprint includes a first XML metadata query, and wherein the second patch fingerprint includes a second XML metadata query, different than the first XML metadata query;
        (ii) wherein at least the first and second patch fingerprints are both associated with a specific software update;
    (b) an update server in communication with the package computer;
        (i) wherein the update server stores at least the first and second patch fingerprints of the package computer;
        (ii) wherein the update server is located remote from the package computer; and
    (c) a discovery agent configured to separately interact with both the first XML metadata query and the second XML metadata query to produce first target computer information relating to the first target computer;

---

[9] This Court notes that the Parties may extrapolate its ruling reflected herein, and if necessary, seek leave to file subsequent motions to clarify whether the reasoning contained herein applies to additional asserted claims if unclear.

wherein the system is configured to:

(A) send the first XML metadata query and the second XML metadata query of the first and second patch fingerprints from the update server to the discovery agent to gather the first target computer information;

    (I) wherein the first target computer information is related to at least registry information, software presence information, and software version information relative to the first target computer;

    (II) wherein a first portion of the first target computer information is associated with the first patch fingerprint and the first XML metadata query;

    (III) wherein a separate second portion of the first target computer information is associated with the second patch fingerprint and the second XML metadata query;

(B) determine, at the update server based on the first target computer information, whether the specific software update is both applicable to and absent from the first target computer;

    (i) wherein the determination step comprises:

        (1) evaluating the first portion of the first target computer information to determine the applicability of the specific software update to the first target computer; and

        (2) if the specific software update is applicable to the first target computer, then evaluating the second portion of the first target computer information to determine the presence or absence of:

            (A) the applicable files;

            (B) the applicable registry keys; and

            (C) the applicable configuration information of the specific software update;

wherein the system is configured to, based on the determination (B), download the specific software update to one of (i) the update server and (ii) the first target computer.

[Doc. 1-2 at cl. 1]. Claim 6 of the '147 Patent depends on Claim 5,[10] claiming:

The system of claim 5, further comprising:

---

[10] Claim 5 discloses:

The system of claim 1, further comprising:

an update task list located on the update server;
wherein the update server is configured to review the update task list for a target computer that has not received the specific software update and, if one is found, add an update task identifier for that target computer to the update task list.

[Doc. 1-2 at cl. 5].

a monitor configured to monitor the installation of the specific software update on the first target computer;

wherein, if the monitor determines that the installation of the specific software update was successful, the update server reviews the update task list for a target computer that has not received the specific software update and, if one is found, adds an update task identifier for that target computer to the update task list.

[*Id.* at cl. 6].

Ivanti argues that the claimed ability to monitor after installation to determine whether the update causes subsequent problems on the target computer is a further technological advancement in software update solutions.  [Doc. 24 at 15].  On Reply, Patch My PC argues that any post-installation monitoring is simply another example of actions taken by the network administrator in the prior art.  [Doc. 30 at 6].  Defendant further contends that the cited dependent claims do not provide a technological improvement or inventive concept to overcome their abstract nature.  [*Id.* at 6–7].

In comparing Claim 6 with Claim 1 of the '147 Patent, this Court respectfully concludes that Claim 1 is representative of Claim 6, because (1) there is not a material distinction between Claim 1 and the additional claim limitations in Claim 6 and (2) the specification makes clear that the post-installation monitoring is part and parcel of the invention as a whole.  The limitations of Claim 5 are simply a manner by which the functions of the system of Claim 1 may be accomplished.  *See supra*, n.10. Claim 6 adds the additional limitation for post-installation monitoring. While Ivanti argues that this limitation is, in and of itself, inventive because it improves upon the subjective determination by human systems administrators, *see* [Doc. 24 at 12–13], this Court concludes that this additional limitation is inherent part of the claimed invention. For instance, after setting forth that the invention is directed at methods, systems, and configured storage media for discovery software updates, discovering if a given computer can use the software

update, and then updating the computers with the software, the Abstract states "[f]urthermore, when a failure is detected, the rollout is stopped and the software can be automatically removed from those computers that already were updated."  [Doc. 1-1 at 2 (Abstract)].   Likewise, in discussing the Brief Summary of the Invention, the patentee recognizes the inherent task of monitoring by stating "[t]he present invention relates to methods, articles, signals, and systems for determining if software needs updating, and if so, then updating the software across a network with reduced demands on a human administrator.  If the update fails, the computer(s) upon which the update software was installed may be restored to a non-updated state."  [*Id.* at col. 3, ll. 25–32].  The summary further explains that "[a] monitor checks to see that the software installs properly on the target 202, 208, and then continues checking (or can be notified) to ensure that the updated software runs correctly and that the target computer itself doesn't experience any problems in what appear to be unrelated areas."  [*Id.* at col. 4, ll. 55–59].  *See C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004) (pointing to the Summary of the Invention and the Abstract as two places at which "the patent describes in general terms what it deems to be the invention").

Thus, this Court concludes that Claim 1 of the '147 Patent is representative of Claim 6 that further includes a limitation directed at post-installation monitoring.  *Front Row Techs., LLC v. NBA Media Ventures, LLC*, 204 F. Supp. 3d 1190, 1268 (D.N.M. 2016), *aff'd sub nom. Front Row Techs. LLC v. MLB Advanced Media, L.P.*, 697 F. App'x 701 (Fed. Cir. 2017) (citing *Listingbook, LLC v. Mkt. Leader, Inc.*, 144 F.Supp.3d 777, 789 (M.D.N.C. 2015) ("Each of these dependent claims narrows the method of Claim 1 by adding details and functions to improve the information exchange and collaborative process, but none of these claims changes the concept at the core of the claimed method.").

## IV.     Patentability Under *Alice*

"An invention is not rendered ineligible for patent simply because it involves an abstract concept," *Alice*, 573 U.S. at 217, and applications of abstract concepts "to a new and useful end . . . remain eligible for patent protection." *Id.* (quotation omitted).   The Supreme Court has expressed a distinction between the "building blocks of human ingenuity"—which are not patentable—and those abstract ideas "that integrate the building blocks into something more, . . . thereby transforming them into a patent-eligible invention." *Id.* (quotations and alteration marks omitted).   "The 'abstract idea' step of the [*Alice*] inquiry calls upon [courts] to look at the 'focus of the claimed advance over the prior art' to determine if the claim's 'character as a whole' is directed to excluded subject matter." *Affinity Labs of Texas, LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016).   But "[i]f a claimed invention only performs an abstract idea on a generic computer, the invention is directed to an abstract idea at step one." *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1285 (Fed. Cir. 2018).   "Software, however, 'can make non-abstract improvements to computer technology just as hardware improvements can.'" *Id.* at 1285–86 (quoting *Enfish*, 822 F.3d at 1335).   The Court must determine "whether the 'focus of the claims' is on a 'specific asserted improvement in computer capabilities[,] or, instead, on a process that qualifies as an "abstract idea" for which computers are invoked merely as a tool.'" *Id.* at 1286 (quoting *Enfish*, 822 F.3d at 1336).   Patents that involve "the use of computers to conserve human resources by automating work otherwise performed through human labor" may be directed at abstract ideas. *Enco Sys., Inc. v. DaVincia, LLC*, 845 F. App'x 953, 957 (Fed. Cir. 2021) (quotation omitted).

### A.      Step One: Patent-Eligible Concept

With respect to the first step in the Court's analysis under *Alice*, Defendant argues that "[a]ll claims of the [Patents-in-Suit] are directed to the abstract idea of updating software stored on a computer." [Doc. 18 at 16].  Defendant directs the Court to a number of cases it believes are analogous to the instant case, summarizing that "[f]our district court decisions have already analyzed comparable claims relating to the use of networks to update software or other features stored on computers, and all recognize that such claims are directed to abstract ideas." [*Id.* at 17]. Furthermore, Defendant argues that the claims involved in the Patents-in-Suit simply automate the process of a human determining whether an update is needed and installing updates as needed. [*Id.* at 21].  And finally, it contends that the claims describe generic techniques and components for software updates and do not improve on the function of a computer itself. [*Id.* at 22].

Plaintiff contends that the Asserted Claims are patentable and represent inventive progress over the prior art by (1) reliably providing a recipe for determining whether a given computer has already received a particular software update; (2) using a combination of agents and update servers to perform post-patch monitoring to ensure that a deployed patch does not cause subsequent problems on the target machine; and (3) disclose a distributed architecture that includes a central command center for handling the patch deployment and monitoring processes. *See generally* [Doc. 24]. Plaintiff argues that "Patch My PC has not provided any argument concerning claims related to monitoring the target computer post-update for any problems and responding to those problems." [*Id.* at 12–13].  It maintains that the claims in the Patents-in-Suit are directed to technological improvements in software patching. [*Id.* at 13].

On Reply, Patch My PC argues that Ivanti cites only to a single portion of the specification that merely restates the proposition that a patch fingerprint is a "recipe" without any further definition or structure:

> Patch fingerprints 902 give a recipe to allow a repository component to determine if a given software package (associated with the patch fingerprint), patch, driver, etc. should be loaded onto a computer in the system.

*See* [Doc. 30 at 8 (citing Doc. 1-1 at col. 3, ll. 56–59)].

This Court respectfully disagrees with Defendant's assessment that Ivanti's arguments are limited to one single portion of the specification and notes that Patch My PC does not meaningfully address Ivanti's arguments rooted in the specification of the Patents-in-Suit regarding the use of patch fingerprints as a method to determine whether a certain patch exists on a target computer. *Compare* [Doc. 24 at 8-10] *with* [Doc. 30 at 7–8].  Nevertheless, this Court notes that the Federal Circuit has directed lower courts that the § 101 inquiry must focus on the language of the Asserted Claims themselves, as a specification full of technical details may nonetheless conclude with claims that claim nothing more than the broad law or abstract ideas underlying the claims.  *See ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 769 (Fed. Cir. 2019).

Turning to the first independent claims of each of the Patents-in-Suit, this Court agrees that unlike the patent claims in *Finjin*, *Inc. v. Blue Coat Systems*, 879 F.3d 1299, 1304–05 (Fed. Cir. 2018), here, there is no new type of file disclosed in the Asserted Claims.  Instead, the specification of the Patents-in-Suit reflects that patch fingerprints were in prior art, disclosing that:

> Finger Print definitions **906** are also normally associated with an update package suitable for deployment 25 by the system.  Once the need for a particular patch has been established by scanning its signature(s) on all computers within the network it can then be quickly deployed by the administrator by merely selecting the date and time.

[Doc. 1-1 at col. 4, ll. 24–28]. The Asserted Claims do not define any new type of patch fingerprint, but merely define how such patch fingerprint is used. Nor does the inclusion of limitations disclosing the use of XML[11] metadata change this Court's analysis, as nothing in the specification suggests novel "recipe" of using XML, but rather, XML use as a known, preferred implementation for data transfer among other "known or inventive data transfer" methods. [*Id.* at col. 13, ll. 26–28].

Nor is this Court convinced that the circumstances presented herein are akin to those in *McRO*, where the claims were "limited to rules with specific characteristics," that set out "meaningful requirements," and were not "the [same] process previously used by animators." *McRO*, 837 F.3d at 1313, 1314. Here, the first independent claims of the Patents-in-Suit set out meaningful requirements. *See* [Doc.1-1 at cl. 1; Doc. 1-2 at cl. 1; Doc. 1-3 at cl. 1]. While Claim 1 of the '660 Patent discloses a patch fingerprint comprising three additional elements utilizing information gleaned from the target computer about what patches may be needed and whether a particular patch exists on the target computer, *see* [Doc. 1-1 at cl. 1], it is implicit within the specification that the information necessary for the installation of patch fingerprints is gleaned from each network target computer, both historically and as part of the invention. *See* [*id.* at col. 2, ll. 50–51 (discussing the monitoring of target computers and servers); col. 3, ll. 67; col. 4, ll. 1–3].

Further, insofar as Ivanti relies on post-installation monitoring of the target computer to satisfy the first prong of *Alice*, this Court first notes that post-installation monitoring is not disclosed in every Asserted Claim. *See, e.g.*, [*id.* at cl. 1]. And even those Asserted Claims that

---

[11] "XML is a specialized mark-up computer language developed in the mid-1990s that defines a set of rules for encoding documents in both a human- and machine-readable format." *Intell. Ventures I LLC v. Cap. One Fin. Corp.*, 850 F.3d 1332, 1338 (Fed. Cir. 2017)

do include post-installation monitoring do not disclose any definition or structure, but simply, the end outcome.  *See, e.g.*, [*id.* at cl. 11].  As explained by the specification, post-installation monitoring is simply another activity generally performed by humans during the software patching process, i.e., "[w]hile all the installation is occurring, the individual servers must still be monitored. When a server needs attention[,] the administrator is often contacted by another person, who may frantically report that their server is down and must be fixed. . . . Monitoring needs are a second indication of 'administrator agony.'"  [*Id.* at col. 2, ll. 50–54].  Indeed, these claims are analogous to the ones determined by the United States District Court for the Northern District of California to be subject-matter ineligible under § 101 pursuant to a motion for judgment on the pleadings. *See MyMail Ltd. v. ooVoo, LLC*, No. 17-cv-004487-LHK, 2020 WL 2210936, at *22 (N.D. Cal. May 7, 2020), *aff'd*, No. 2020-1825, 202 WL 3671364, at *4 (Fed. Cir. Aug. 19, 2021).

Based on the record before it, Court concludes that the first independent claims of each of the Patents-in-Suit is directed at adding automation to a well-established manual process of identifying and fixing software bugs on computers.  Because this Court has determined that the Asserted Claims in the Patents-in-Suit are directed at this abstract idea, the Court turns to Step Two of the *Alice* analysis.

## B.      Step Two: Inventive Concept

Because the first independent claims of each of in the Patents-in-Suit is directed at an abstract idea, the Court must next determine whether the elements of each claim, both individually and as an ordered combination, transform the nature of the claim into a patent-eligible application. *CardioNet*, 955 F.3d at 1368.  Patch My PC contends that the elements of the claims contained in the Patents-in-Suit fail to amount to more than an abstract idea and lack an inventive concept. [Doc. 18 at 24].  Specifically, it argues that the claims recite functional components automating

what had previously done by human actors. [*Id.*]. It contends that "there is nothing inventive about the claimed combination of elements" and the claim limitations "fail to provide an inventive concept." [*Id.* at 24–25]. Ivanti argues that the asserted claims are not merely functional. [*Id.* at 21]. In addition, it argues that the claimed inventions "embody multiple inventive concepts":

> (1) a novel patch fingerprint that solves the problem of objectively determining whether a specific patch has been applied to a target computer; (2) a monitor for monitoring post-patch installations to detect problems on the target computer; and (3) a distributed architecture that improves security (separating target computers from package computers), improves patch deployment efficiency, and reduces storage requirements at the update server.

[*Id.*].

At step two, the Court "consider[s] the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Alice*, 573 U.S. at 217 (quoting *Mayo*, 566 U.S. at 79). "This transformation into a patent-eligible application requires more than simply stating the abstract idea while adding the words 'apply it.'" *Simio*, 983 F.3d at 1363 (quotation omitted). The Court looks for "an 'inventive concept'—'an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more' than a patent on the abstract idea itself." *Id.* (quoting *Alice*, 573 U.S. at 217–18). "[C]ritically, 'a claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept that renders the invention 'significantly more' than that ineligible concept.'" *Id.* (quoting *BSG Tech*, 899 F.3d at 1290).

To survive step two, the claims must incorporate something "beyond conventional computing hardware and software." *Enco Sys.*, 845 F. App'x at 958. "Claim limitations that recite 'conventional, routine and well understood applications in the art' are insufficient to 'supply an inventive concept.'" *BSG Tech*, 899 F.3d at 1290 (quoting *Ariosa Diagnostics, Inc. v. Sequenom,*

*Inc.*, 788 F.3d 1371, 1378 (Fed. Cir. 2015)).  "Whether a combination of claim limitations supplies an inventive concept that renders a claim 'significantly more' than an abstract idea to which it is directed is a question of law," although "[u]nderlying factual determinations may inform this legal determination."  *Id.*  "Any fact that is pertinent to the invalidity conclusion must be proven by clear and convincing evidence."  *e-Numerate Sols., Inc. v. United States*, 149 Fed. Cl. 563, 575 (2020) (internal citations and quotations omitted).  At the motion to dismiss stage, the Court accepts all factual allegations in the Complaint as true, but those factual allegations must be tied to the claim language or specification.  *Id.* at 587.

Each Party relies heavily on their respective arguments at step one of the *Alice* analysis on step two.  *See* [Doc. 24 at 16–22; Doc. 30 at 11–13].  But Ivanti contends that there are factual issues that preclude this Court from determining whether the Asserted Claims contain an inventive concept.  *See* [Doc. 24 at 16–17].  To that end, Ivanti does not point to a factual allegations contained in its Complaint, but instead, further argues that the use of patch fingerprints to ascertain, install, and monitor software upgrades constitutes an inventive concept and that the components of the claimed invention are distributed in a way that allows multiple applications on multiple computers to be simultaneously updated from a single control center, instead of in a piecemeal fashion.  [*Id.* at 18–19].  Plaintiff also refers to the determinations of the United States Patent and Trademark Office ("USPTO") as evidence that the Asserted Claims are patent-eligible under § 101.  [*Id.* at 18].  On Reply, Patch My PC never addresses the procedural juncture or its burden at step two of *Alice*, but instead argues that the USPTO's actions are irrelevant to the Court's § 101 analysis and the purported technical improvements do not describe technical improvements to computerized systems, but draw comparisons to human-administrator-based systems and fails to show how any of the claims describe the purportedly inventive concepts.  [Doc. 30 at 11–13].

As an initial matter, Plaintiff does not suggest, nor could it, that the Court is bound by the patent eligibility determinations of the USPTO.  Plaintiff also does not cite any case, and this Court independently found none, where the court took judicial notice of the USPTO's notice of eligibility and determinations on reexamination and weighed them in determining whether an inventive concept exists in the context of step two of a § 101 analysis.  *See* [Doc. 24 at 18].  Thus, this Court finds it unnecessary to take judicial notice of the USPTO's notice of allowability or reexamination of the '660 Patent.

This Court is persuaded that the first independent claim of each of the Patents-in-Suit is analogous to those cited by Defendant, and simply utilizes known components—like the patch fingerprint—in understood and conventional ways. Indeed, nothing in the claim language employs specific directions regarding programming or even instructions for what information the patch signature and/or the existence test is using or how it should be used, or how monitoring is accomplished.  Instead, the Asserted Claims utilize generic statements regarding information gathering and exchange; use of such information within configurations; and monitoring the attempted download for an outcome.  Plaintiff's conclusory arguments that the claims embody multiple inventive concepts are not supported by its citations to the claim language or the specification.

Thus, based on the record before it, this Court concludes that the Asserted Claims are invalid as claiming unpatentable subject matter under 35 U.S.C. § 101.  The Court will thus **GRANT** the Motion to Dismiss.

## CONCLUSION

For the reasons set forth herein, **IT IS ORDERED** that:

(1)      Defendant Patch My PC, LLC's Motion to Dismiss [Doc. 18] is **GRANTED**;

(2)     Plaintiff Ivanti, Inc. shall **SHOW CAUSE** no later than **April 20, 2023** as to why

this case should not be dismissed in its entirety; and

(3)     The claim construction hearing currently set for April 19, 2023 is **VACATED**.


DATED:  April 13, 2023                         BY THE COURT:

_____

Nina Y. Wang
United States District Judge